**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00121 (EGS)** |
| **v.** | : | |
| | : | |
| **JAMES BONET,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence James Bonet to 45 days' incarceration, 12 months' supervised release, and $500 in restitution.

### I.    Introduction

The defendant, James Bonet, is a 30-year-old food service employee from upstate New York who participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage. In a deeply misguided effort to "tak[e] our country back," Bonet, after posting a video calling police "pieces of shit," seeing a rioter fight with police, and watching a woman being carried away on a stretcher, breached the Capitol and celebrated this perceived accomplishment by filming himself smoking a joint inside a Senator's office that was trashed during the riot.

James Bonet pleaded guilty to one count of 18 U.S.C. § 1752(a)(1), Unlawful Entry in a Restricted Building or Grounds. A jail sentence is appropriate in this case primarily because (1)

1

Bonet smoked what appears to be marijuana in a Senator's private office and broadcast it on social media and (2) Bonet's social media messages show that his unlawful presence in the Capitol was part of an intentional desire to forcefully "tak[e] our country back"; after calling police battling rioters "pieces of shit" and advancing to an entrance to the Capitol, he declared: "[w]e made it in the building bitches! We're taking it back! We are taking it back, we made it in the building!"  In addition, Bonet saw numerous red flags as he approached the entrance to the Capitol that told him to turn back.  He did not.

The Court must also consider that Bonet's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification combined with the defendant's celebration of the riot, including by taking a selfie video of himself smoking a joint in the private office of a member of Congress, renders a jail sentence both necessary and appropriate.

## II.      Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

The government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 38 (Statement of Offense), at ¶ 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop, we turn to the defendant's conduct and behavior.

*Bonet's Decision to Travel to Washington, D.C.*

Following the November 2020 presidential election, Bonet began to talk to his coworkers at the Five Guys restaurant where he worked about his belief that the presidential election had been stolen. Bonet had also espoused other conspiracy theories at work, including that the government was trying to hide a species of alien lizard people who live underground. On social media, he posted a theory that the COVID-19 virus was a hoax.

Bonet traced the origin of his belief in the stolen election to a distrust of government and media that was influenced by an experience where he changed his diet and lost weight. Bonet's weight loss caused him to doubt the nutritional information he had previously learned from governmental and media sources (*i.e.*, the food pyramid) and then, to wonder if the government and media were deceiving him about other things.  An episode of "The Joe Rogan Experience" podcast in the fall of 2020 about nutrition and the upcoming presidential election spurred Bonet to follow politics more closely.  He began seeking out and following others on social media, such as Alex Jones, Dr. Shiva Ayyadurai, and Mark Dice.  Bonet became very active on social media; after the 2020 election, he re-posted information regarding election fraud conspiracies, gleaned from these "influencers" and others, which he believed to be true.  He saw online posts regarding "Stop the Steal" events (including by Dr. Ayyadurai) and decided to attend a rally in support of former president Trump in Washington, D.C., in December 2020. The rally gave Bonet the sense that many others shared his feelings about the election. After attending the December 12, 2020 rally in support of President Trump, he continued to follow and get his news from these social media personalities, and began to follow others, including attorneys Lin Wood and Sidney Powell.  From social media, Bonet also became aware of the "Stop the Steal" event scheduled for January 6, 2021 in Washington, D.C.  He recalled seeing the event promoted on a Facebook

group page under the name "America's Frontline Doctors," which also noted that Dr. Simone Gold planned to attend and speak.[1] Bonet decided to return to Washington, D.C. On January 5, he left the Saratoga Springs, New York, area in the evening and drove to Washington by himself, arriving the following morning.

*Bonet's Conduct on January 6*

On January 6, Bonet attended the rally in support of ex-President Trump at the Ellipse on January 6.  Toward the end of Trump's speech, Bonet heard a group, whose members were wearing tactical vests and ballistic helmets, talking about heading to the Capitol. He decided to follow them.

Bonet documented his movements as he approached and ultimately entered the Capitol Building.  En route to the Capitol, Bonet filmed others walking and posted videos to social media, such as the following, with the caption "Taking our country back":

---

[1]    America's Frontline Doctors describes itself as "America's Premier Civil Rights Organization."  It has promoted ivermectin and hydroxychloroquine as treatments for COVID-19. Its founder, Dr. Simone Gold, was arrested for entering the Capitol during the riot on January 6 and has been charged with obstruction of an official proceeding.  *United States v. Simone Melissa Gold,* 21-cr-85-CRC-2.



**Figure 1**

Bonet arrived on Capitol grounds and entered the restricted area. He filmed a small group of law enforcement officers, outnumbered by the mob and standing at the top of a staircase leading to the Capitol Building, which he captioned "scumbags" before posting it on social media. As the officers fired crowd control munitions, Bonet yelled multiple times that they were "pieces of shit," claiming they were "shooting" at "innocent protestors."  Exhibit A (screen recording from Bonet's social media) at 1:51-2:05).  He saw uniformed personnel leaving the Capitol with a woman on a stretcher (likely Ashli Babbit).  He also saw another individual get into a fight with a Capitol Police officer and observed people throwing objects at the building.

While on the West Plaza, at the foot of the scaffolding set up for the presidential inauguration, Bonet posted to social media with the caption "[r]ight in the doorsteps this is our house we will take it back."



**Figure 2**

As he approached the Senate Wing Door, Bonet said, "[w]e made it in the building bitches! We're taking it back! We are taking it back, we made it in the building!"  He posted another video to social media that included the following images, under the heading "made it in," at one point turning the camera on himself, so that there could be no question who was breaching the Capitol:



**Figure 3**



**Figure 4**

Bonet entered the Capitol at approximately 3:09 p.m., staring at his phone. He appeared to hold his phone up, as if taking a video, and turned right, walking down a hallway. At the time, a group of Capitol Police officers were at the other end of the lobby, blocking rioters from advancing toward the Senate Chamber, but Bonet did not appear to converse or otherwise engage with any officers. In the image below, Bonet is circled in yellow, and an arrow points to the group of Capitol Police officers.



**Figure 5**

Walking down the hallway, Bonet entered S-140, the hideaway office of Senator Jeff Merkley of Oregon, where he remained for approximately four minutes.[2]   Inside the office, the defendant smoked a marijuana cigarette, with other rioters behind him, and declared that he was "at the Capitol Building, smoking with all my people!"   In the video, he panned around the Senator's office, while keeping himself in the frame, smiling throughout. Several other rioters are visible behind him. Ex. A at 0:30-0:41. Below are two screenshots:

---

[2]      While the office was not labeled as Senator Merkley's, it clearly was a private office, with personal mementos on the walls and typical office furniture.





**Figure 6**     **Figure 7**

James Bonet was not the only rioter in Senator Merkley's office, nor was he even the only rioter who decided to light a joint in that spot.[3]  Collectively, the rioters who invaded the office throughout the day—when it should have been a workspace for a Senator during the certification of the Electoral College vote—prompted Senator Merkley to post a video at 11:36 p.m. that night chronicling the damage to his office. The three-minute long video, available on Twitter at

---

[3]      The Government's Sentencing Memorandum in *United States v. Felipe Marquez*, 21-cr-136 (RC), ECF No. 28 at 8, describes how Marquez entered Senator Merkley's office at around 3:00 p.m., shortly before Bonet did, filmed other rioters smoking in the room, and himself smoked from a vape pen.  Defendant Brandon Fellows also described how "I walked in there's just a bunch of people lighting up in some Oregon room…they were smoking a bunch of weed in there."  Affidavit in Support of Criminal Complaint and Arrest Warrant, *United States v. Brandon Fellows,* No. 21-cr-83 (TNM), ECF No. 1 at ¶ 15.

https://twitter.com/SenJeffMerkley/status/1347039504528498688 (Exhibit B), was rebroadcast by major news outlets.

In the video, Senator Merkley explained that rioters appeared to have "smashed the door virtually off its hinges," even though the door was unlocked. He pointed out how the floor was littered with debris. He showed a scroll made for him by a Chinese calligrapher that rioters had torn from the wall. He said that the rioters "left a Trump flag here to mark their presence." Senator Merkley narrated how the rioters "stole the laptop that was sitting on the table," and panned across his conference table to show the damage and disarray. He then zoomed in on ashes and a cigarette butt on a desk to note that the rioters appeared to have been "smoking something" in the office, before focusing on another discarded cigarette butt or joint on the floor. In Senator Merkley's words, one could "count this office trashed."

After spending approximately four minutes in Sen. Merkley's office, Bonet continued into the Capitol's Crypt, where he filmed another video of the rioters, in which he joined in a call-and-response chant, "Whose house?" "Our house!"  He posted the video to social media. Ex. A at 0:16-0:28.  Bonet then returned along the same hallway back to the Senate Wing Door and left the Capitol Building at 3:26 p.m., 17 minutes after he had entered. Bonet knew at the time he entered the U.S. Capitol Building that he did not have lawful authority to enter the building.

*The Charges and Plea Agreement*

On January 25, 2021, James Bonet was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On January 27, 2021, he was arrested in the Northern District of New York. On February 16, 2021, he was charged by four-count Information with the same charges. ECF No. 5. On June 2, 2021, the grand jury returned a six-count indictment, adding violations of 18 U.S.C. § 1512(c)(2) (obstruction of an official

proceeding) and 40 U.S.C. § 5104(e)(2)(C) (entering and remaining in certain rooms in a Capitol Building) to the four misdemeanors previously charged. ECF No. 25.

On October 7, defendant pleaded guilty to Count Two of the Indictment, charging him with a violation of 18 U.S.C § 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds. The government agreed to dismiss the remaining counts at sentencing. In his plea agreement (ECF No. 37), Bonet agreed to pay $500 in restitution. The Court asked the parties to address two issues for sentencing: whether incarceration was the appropriate punishment here, and the sufficiency of the $500 restitution amount agreed to in the plea agreement.

In his plea agreement, James Bonet also agreed to be interviewed by the FBI. The interview took place on October 14, 2021. Consistent with his sentencing memorandum, Bonet described the origins of his distrust in the government and the media and his decision to travel to Washington, D.C. on January 6. He described his march to the Capitol and acknowledged seeing a woman being carried away on a stretcher and conflict between rioters and police. He also described his path through the Capitol and his actions inside. He claimed that police officers told a crowd inside the Capitol that people were allowed to walk around for a bit and then leave.

Bonet has been compliant with his conditions of release.

## III.   Statutory Penalties

Bonet now faces a sentencing on a single count of 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to one year of imprisonment, a fine of up to $100,000, and a term of supervised release of one year. Because defendant has pled guilty to a Title 18 offense, the Court may order additional restitution to a "victim of such offense" under the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), or according to the terms of his or her plea

agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). By plea agreement, the parties have agreed that the riot caused approximately $1.5 million of damage to the United States Capitol and the defendant has agreed to pay restitution in the amount of $500. The government discusses restitution further at the end of this memorandum.

## IV.     The Sentencing Guidelines and Guidelines Analysis

The Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Bonet's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | 2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

PSR ¶¶ 27-36.[4]

---

[4]     Pursuant to U.S.S.G. §1B1.2 and Appendix A, if more than one Guidelines provision may apply to a particular offense, a court should "use the guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted." Appendix A provides two Guidelines options for a violation of 18 U.S.C. § 1752: U.S.S.G. § 2A2.4 (obstructing or impeding officers) or U.S.S.G. § 2B2.3 (trespass). The government agreed in the plea agreement that U.S.S.G. § 2B2.3 is the applicable Guideline here, where defendant has pleaded guilty to 18 U.S.C. § 1752(a)(1), the crime of illegal entry.

The U.S. Probation Office calculated Bonet's criminal history as Category II. PSR ¶ 39. Bonet has two criminal history points, one for a 2014 conviction for possession of marijuana (over two ounces), which resulted in a sentence of three years' probation, and one for a 2013 conviction for marijuana possession. PSR ¶¶ 37a-38. Accordingly, the U.S. Probation Office calculated Bonet's Guidelines range at 0-6 months. PSR ¶ 80.[5]

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines).

---

[5]     Bonet's plea agreement (and the draft PSR) included only Bonet's 2014 conviction, and thus estimated that he would be in Criminal History Category I (1 point).  Regardless of whether Bonet is in Criminal History Category I or II, his guidelines range at offense level 4 remains 0-6 months.

> Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will, the Guidelines will be a driver of consistency and fairness moving forward.

## V.     Sentencing Factors Under 18 U.S.C. § 3553(a)

Sentencing is ultimately guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have

been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors, taken together, weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated

sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

Had the defendant personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

Here, Bonet's social-media narration of his journey to the U.S. Capitol is an aggravating factor. Not only do these messages reveal Bonet's desire to storm the Capitol, they broadcast his criminal acts to a wider audience in real time, using stark, crass language to highlight his lack of respect for the seat of our government, the rule of law, and the peaceful transfer of power. This appears to be what Bonet meant when he posted that they were "taking our country back."  In case there was any confusion as to his intent, as he approached the Capitol, he made the same point twice more, with increasing intensity: "[r]ight in the doorsteps this is our house we will take it back," and, finally, "[w]e made it in the building bitches! We're taking it back! We are taking it back, we made it in the building!" As members of Congress and their staffs hid nearby, Bonet entered a nonpublic office that had been forcibly entered and ransacked. He lit a joint and celebrated what the riot had accomplished. He filmed and posted that too.

Bonet's sentencing memorandum suggests that he showed deference to law enforcement. Given that he called police "pieces of shit" and "scumbags," this is doubtful. Nonetheless, after describing how he entered the Capitol at 3:09 p.m., Bonet claims that he asked one of the officers if he could "get in trouble" for entering the building and was told "no."  (Bonet Sentencing Mem. at 3). The government is not aware of evidence of any conversation between Bonet and a police officer. Capitol Police security video of

Bonet's entrance to the Capitol shows that Bonet walked through the doorway staring at his phone. He stopped for a moment to hold it up and appeared to film the scene before turning right and walking toward the hallway toward Senator Merkley's office. Bonet did not pause to talk to any officer, nor did he appear to hesitate before walking further into the building. The group of Capitol Police officers in the area was halfway across the lobby from Bonet, with many other rioters in between them. Regardless, even if a police officer told Bonet he would not "get in trouble" for entering the Capitol, Bonet had already advanced through the restricted area to the Capitol Building's entrance despite seeing a woman being carried away on a stretcher, the firing of crowd-control munitions, and conflict between rioters and police.  He had plentiful signals that he was not allowed inside.

And no reasonable person could have thought the police had given him permission to do what he did next. Bonet wasted no time celebrating his short-lived victory ("taking our country back") in a Senator's personal office by lighting a joint and memorializing the event on social media, all while members of Congress and staffers hid in a bunker or barricaded themselves in other officers. His decision to do so is the principal aggravating factor in his case. Bonet smiled broadly and appeared to enjoy being "at the Capitol smoking with all my people" as he panned around the room. This was not just some boyish prank. Bonet was angry about the election and full of conspiracy theories. Smoking a joint in a private office was a callous act of arrogance, a show of power and control. It showed that, in that moment, Bonet viewed the office of a member of Congress as the dominion of himself and all the other members of the mob. When Bonet filmed himself smoking, moreover, he had already seen signs of violence: a woman being removed from the Capitol on a stretcher.  Police firing crowd control munitions. Fighting between the mob and law enforcement officers. This should not have been cause for celebration.

The government recognizes that not all the circumstances of Bonet's offense are aggravating. He did not engage in extensive planning or come prepared for violence. He does not appear to have been a member of any organized groups and traveled to the Capitol on his own. He was inside the Capitol for about 17 minutes, having entered through an open door nearly an hour after it was first breached. He did not travel very far inside the Capitol. The government has no information suggesting he destroyed evidence or personally defied law enforcement. And his statements, while celebrating the mob and its actions and deriding law enforcement, did not expressly espouse violence.

But the possibility that Bonet could have done something worse does not change the fact that what he did do that day establishes a need for incarceration. His baseline conduct, breaching the Capitol, is serious: the riot could not have succeeded without the efforts of even more minor contributors like Bonet. On top of that, Bonet's social media posts indicate that he breached the Capitol as part of an effort to seize control from Congress. And, by invading a Senator's office, smoking a joint, and filming himself doing so, he "spiked the ball," emphasizing how the mob had usurped—for a few hours, at least—control of the Capitol.

Not all the harm Bonet caused was abstract: approximately eight hours later, Senator Merkley took a break from the certification to document the damage that Bonet and others had caused in his office, including the remnants of smoking. *See* Ex. B. Even if Bonet himself was not the individual directly responsible for the scroll ripped from the wall, or the debris strewn across the floor, his actions in Senator Merkley's office contributed to a lawless atmosphere there, potentially emboldening others to feel comfortable causing damage as they pleased.

At the change of plea, the Court asked the parties to address whether incarceration is a necessary component of a sentence, given Bonet's participation in the Capitol riot. Based primarily on the nature and circumstances of the offense, the government believes that it is.

### B.  The History and Characteristics of the Defendant

Bonet has had steady employment with a branch of Five Guys since 2012 and returned to school in 2021 to work toward a college degree. PSR ¶¶ 62, 65. He has two convictions for marijuana possession, one of which resulted in a fine, and one of which resulted in probation. PSR ¶¶ 37-38. While that type of criminal history ordinarily would not support incarceration, marijuana was involved in the most Bonet's conduct inside the Capitol. As described above, his decision to smoke marijuana in a Senator's office and film and post a video of himself grinning while doing so suggests a certain callousness; as Bonet describes it, "arrogance and disrespect."  (Bonet Sentencing Mem. at 3). Bonet represents that he has stopped smoking marijuana since being arrested. *Id.*

While Bonet did not proactively cooperate with the government or turn himself in, he was forthcoming in his post-plea debrief and provided a full account of his conduct on January 6. He did not display a significant amount of remorse, although he did express that he has turned his life in another direction, choosing to spend his time pursuing formal education rather than posting on social media. And, based on his own account, Bonet's decision to breach the Capitol was not the product of longstanding views: it began in the fall of 2020, when, having his faith in nutrition shaken, he began to follow conspiracy theories, including those concerning the 2020 election.

As Bonet's sentencing memo acknowledges, he was susceptible to false voter-fraud claims and conspiracy theories. (*See* Bonet Sentencing Mem. at 8). Bonet was "led to believe" that he had been disenfranchised by individuals he respected and considered "highly sophisticated

intellectuals"; he "couldn't imagine they would spread false claims." *Id.* These individuals fed Bonet the stories and encouraged the beliefs that led him to decide that storming the Capitol was the patriotic thing to do, and he failed to recognize what a gross error in judgment he was making. However, Bonet is ultimately responsible for that error, for not recognizing that, no matter what he believed about the election, no matter what people around him were saying, taking over the Capitol was no way to respond. Moreover, Bonet's susceptibility to the influence of such personalities also creates concern about what he might do if his decision to turn away does not stick, and if he gravitates to the pull of such figures again.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[6] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 8/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

---

[6] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. 7/19/21 at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Matthew Mazzocco*, 21-cr-54 (TSC), Tr. 10/4/2021 at 24 ("What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next,

something that has happened with regularity over the history of this country. That mob was trying to overthrow the government.") (statement of Judge Chutkan).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. 7/19/21 at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. It is also important to make clear that following social media influencers is not a substitute for exercising independent judgment and critically evaluating those sources before committing a crime. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Bonet's conduct during the Capitol riot indicates some need for specific deterrence. To light up a joint and film a smiling selfie shortly after seeing a fatally wounded woman being carried away in a stretcher, after watching battles between law enforcement in rioters, and knowing that the mob had overrun Congress, raises concerns about the kinds of choices James Bonet will make in the future.

True, there is no indication of any longstanding advocacy of insurrection or violence. After January 6, moreover, Bonet does not appear to have made statements celebrating or excusing the riot, conduct that could raise questions about whether he poses an ongoing threat. And, while he has not expressed significant remorse, Bonet did provide a thorough account of his actions on January 6 in his post-plea debrief. He has represented that he has made important changes in his life since January 6, spending his time on education rather than following proponents of conspiracy

22

theories on social media. The government acknowledges Bonet's efforts to pursue more positive, productive endeavors, such as his education, which reduces the need for specific deterrence, should he continue in that direction.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[7] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[8] The government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that

---

[7]      Attached to this sentencing memorandum as Exhibit C is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[8]      Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-164 (RCL); *United States v. Valerie Elaine Ehrke*, 21-cr-97 (PFF); *United States v. Donna Sue Bissey*, 21-cr-165 (TSC), *United States v. Douglas K. Wangler and Bruce J. Harrison*, 21-cr-365 (DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 21-cr-164 (RCL), Tr. 6/23/2021 at 19.

The government and the sentencing courts have already begun to make distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long they remained inside, the nature of their conduct inside the Capitol, any statements (on social media or otherwise), etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United*

*States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants who spent time in other sensitive places within the Capitol. A defendant's entry into a

sensitive space, such as the Senate Floor or a member's office, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda. A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people. That person's presence is even more disruptive. An unauthorized individual in a private office poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway.

One of the most famous photographs from January 6 is that of a rioter in Speaker Pelosi's office, with his feet on her desk. *See* Amended Complaint, *United States v. Richard Barnett,* 21-cr-38, ECF No. 3, at 2. That photograph has become notorious likely for exactly this reason, because of what invading the office of a member of Congress represents: a show of intimidation, an attempted display of power, above and beyond entering the building. As noted above, while Senator Merkley's office was not labeled as such, it was clearly recognizable as a private office, and thus implicates similar concerns. Another rioter, Brandon Fellows, recognized it as some sort of "Oregon room."  Affidavit, *Fellows, supra*, ECF No. 1 at ¶ 15.

In *United States v. Derek Jancart and Erik Rau*, 21-cr-148 (JEB) and 21-cr-467 (JEB), the defendants pled guilty to misdemeanor charges of 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in the Capitol building) in connection with penetrating the Capitol building all the way to the Speaker's Conference Room. Judge Boasberg sentenced the defendants each to 45 days of incarceration. A misdemeanant who reached the Senate Floor, even though she does not appear to have known where she was, also received a sentence of incarceration. *United States v. Courtright,* No. 21-cr-72 (CRC) (30 days incarceration, one year supervised release).

Like Jancart and Rau, Andrew Ericson went to the Speaker's Conference Room; he posed for a selfie there, as well as for as a photograph resting his feet on the conference table. Bonet smoked marijuana; Ericson took a beer from a mini-fridge. Gov. Sentencing Mem., *United States v. Andrew Ericson,* 21-cr-506 (TNM), ECF No. 37 at 3.   Like Bonet, Ericson posted his involvement to social media. *Id.* at 4. Like Bonet, Ericson was aware of the crowd outside. See id. at 3, 7-8, 13. The government recommended 60 days' jail time, and Judge McFadden imposed a sentence of 20 days' imprisonment, discussing the defendant's entry into an office as follows: "That's a private area and your violation of that space suggests a certain brazenness and intentionality that requires consideration in your sentence. You could have caused a very dangerous and fearful scene had the speaker or her staff been present in the office when you and others entered it." *Ericson,* Tr. 12/10/21 at 21. Judge McFadden concluded that entering offices put Ericson in a "different category" than people "who were only in areas that would normally be open for tours." *Id.*

In *United States v. Matthew Mazzocco*, 21-cr-54 (TSC), the defendant pled guilty to a misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating or picketing in a Capitol Building) in connection with spending time inside the Spouse's Lounge of the Capitol, and Judge Chutkan sentenced the defendant to 45 days of incarceration. While inside the Spouse's Lounge, Mazzocco warned others not to take or destroy anything and said that they were probably going to get in trouble for what they were doing—unlike Bonet, who lit a joint. Gov. Sentencing Mem., *Mazzocco*, 21-cr-54, ECF No. 28 at 6. Like Bonet, however, Mazzocco took smirking photographs of himself during the riot. *Id.* at 2, 12. He was also aware of the crowd outside the Capitol and entered through the Senate Wing Door not long before Bonet did. *See id.* at 3, 7-8, 13.

27

Another defendant who entered an office space, Charles Pham, also recently received a sentence of 45 days' imprisonment. *United States v. Charles Pham,* No. 21-cr-109 (TJK). While Pham was an active-duty police officer who downplayed his conduct to the FBI, other facts of his case resemble Bonet's: he saw confrontations between rioters and police before entering; he yelled "we're taking the house back!," he was inside the building for approximately 20 minutes. Gov. Sentencing Mem., *Pham*, ECF No. 36, at 2.

The government acknowledges that Felipe Marquez, who also entered Senator Merkley's office, received a sentence of three months' home detention; the government had recommended four months' incarceration. *United States v. Marquez,* 21-cr-136 (RC). Judge Contreras, however, explained that Marquez's documented mental-health issues had a "significant influence" on his sentence, and believed that probation would best allow Marquez to receive mental-health treatment. *Marquez,* Tr. 12/10/21 at 32, 34, 37. One other defendant who entered Senator Merkley's office also received a probationary sentence, but he was a 68-year-old retiree with no criminal record who was there for less than a minute, and there was no evidence that he engaged in any flagrant conduct while there. *See United States v. Edwards,* 21-cr-366 (JEB).

In any event, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). "[E]very sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have

imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## VI.     Restitution

At the change of plea, the Court asked the parties to address the issue of restitution in their sentencing memoranda.

### A. The Court May Calculate Restitution under the VWPA or Order the Amount Agreed to in the Plea Agreement

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663) bestows such authority here, where defendant has been convicted under Title 18. 18 U.S.C. § 3663(a). The VWPA "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The sentencing court may decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. § 3663(a)(1)(B)(ii).

Restitution must be "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990). It also requires identification of a victim, defined as "a person directly and proximately harmed as a result of" the offense of conviction. *See* 18 U.S.C. §

29

3663(a)(2). It identifies covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1096-97; § 3663(b). The government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See United States v. Emor*, 850 F. Supp. 2d 176, 202 (D.D.C. 2012). The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[9] *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted).

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d); *see* 18 U.S.C. § 3556 (directing that sentencing court "may" impose restitution under the VWPA and "shall" use the procedures set out in Section 3664).[10] Because this case essentially involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally

---

[9]    The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513.
[10]    Several other criminal statutes authorize restitution for specific offenses. *See, e.g.*, 18 U.S.C. § 43(c) (damaging or interfering with an enterprise involving animals); 18 U.S.C. § 228(d) (child support violations; 18 U.S.C. § 1593 (peonage, slavery, and trafficking in persons); 18 U.S.C. § 2248 (sex crimes); 18 U.S.C. § 2259 (sexual exploitation of children); 18 U.S.C. § 2264 (domestic violence); 18 U.S.C. § 2327 (telemarketing fraud); 18 U.S.C. § 853(q) (amphetamine and methamphetamine offenses). None of those statutes are at issue in Bonet's case.

liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A) (requiring that, for restitution imposed under Section 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h)

The VWPA also authorizes the Court to impose restitution "to the extent agreed to by the parties" in the plea agreement. 18 U.S.C. § 3663(a)(3). *See* 18 U.S.C. § 3663(a)(3); *see United States v. Zerba*, 983 F.3d 983, 986 (8th Cir. 2020). A defendant's agreement to pay restitution under Section 3663(a)(3) is a binding promise, *United States v. Pappas*, 409 F.3d 828, 830 (7th Cir. 2005), and the sentencing court is not required to independently evaluate the defendant's ability to pay when restitution is made part of the plea agreement under that provision, *United States v. Allen*, 201 F.3d 163, 167-68 (2d Cir. 2000).

In summary, under the VWPA, the Court could, after identifying a victim, impose restitution to cover certain costs identified in the statute, including lost property and particular expenses of recovering from bodily injury. The focus would be Bonet's conduct and the harm suffered by the identified victim as a result. *See Emor*, 850 F. Supp. 2d at 202. A "reasonable estimate" or reasonable approximation would be sufficient. *See, e.g., Gushlak*, 728 F.3d at 196 (2d Cir. 2013). Alternatively, the court could order Bonet to pay the $500 restitution agreed to in the plea agreement under Section 3663(a)(3). *See Anderson*, 545 F.3d at 1078-79.

**B.  The Court Should Order $500 Restitution, as Agreed to in the Plea Agreement**

The government and Bonet, pursuant to the plea agreement, have requested the Court to

apportion liability for restitution for damages arising from the riot at the United States Capitol. For this case, the parties have agreed that the Court may impose restitution in the amount of $500. This amount fairly reflects Bonet's role in the offense and the damages resulting from his conduct, but also considers the various legal and factual issues associated with calculating the actual losses for property damage to the United States Capitol and incurred by law enforcement agencies, additional costs incurred for security personnel, and bodily injuries sustained by law enforcement personnel.

As noted above, determining the restitution amount is an "inexact science," *James*, 564 F.3d at 1246, that must be based on a "reasonable approximation of losses supported by a sound methodology," *Gushlack*, 728 F.3d at 196. The nearly $1.5 million figure quoted in the defendant's plea agreement represented loss estimates provided by Architect of the Capitol as of mid-May 2021. The government continues to investigate losses that resulted from the breach of the Capitol on January 6, 2021, a process that involves several facets. As a factual matter, the government is continuing to collect evidence concerning, *inter alia*, (1) the cost of damage to the Capitol Building and Grounds, both inside (*e.g.*, doors, windows, offices, office equipment, hallways, the Rotunda, the Crypt, etc.) and outside (*e.g.*, doors, windows, barricades, scaffolding, etc.); (2) the costs associated with the deployment of additional law enforcement units to the Capitol on January 6th; (3) the cost of broken or damaged law-enforcement equipment; (4) the cost of stolen property; and (5) costs associated with bodily injuries sustained by law enforcement officers and other victims. As a legal matter, *some* of these costs (such as property damage and medical injuries) clearly fall within the scope of the restitution statutes as applied to *some* defendants (*e.g.*, defendants who broke a window or committed aggravated assault against a law enforcement officer). But other costs, including employees' work time (*i.e.*, the costs associated with deploying additional law enforcement units to the Capitol), *see United States v. Wilfong*, 551 F.3d 1182, 1184 (10th Cir.

2008), and the proper method for assessing value of damaged or destroyed property, *see United States v. Shugart*, 176 F.3d 1373, 1375 (11th Cir. 1999), raise more challenging questions that should be resolved as they arise. Moreover, apportioning these specific losses to Bonet, or determining the losses for which he could be held jointly and severally liable also raises difficult factual and legal questions.

To apportion the $1.5 million figure among defendants, the government estimated that 2,000-2,500 individuals were unlawfully present in the Capitol Building, arriving at figure of approximately $700 of damage per person. The government then determined that plea agreements for individuals convicted of felonies would require them to pay more—$2,000—and defendants pleading to misdemeanors would be required to pay less—$500. If the government had specific evidence that a defendant damaged property, stole property, or caused injury to an officer, it would require the defendant to pay restitution for that specific conduct. As relevant to Bonet, the government has received information that, while the rioters made a mess of Senator Merkley's office, repair costs were minor.

## VII.   Conclusion

As explained above, taken together, the Section 3553(a) factors support a sentence of incarceration. Balancing these factors, the government recommends that this Court sentence James Bonet to 45 days' incarceration, one year of supervised release, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Bonet's liberty as a consequence of his behavior, while crediting his positive accomplishments since January 6.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:    _____*/s/ Alexis J. Loeb*_____
        ALEXIS J. LOEB
        CA Bar No. 269895
        Assistant United States Attorney
        Detailee
        U.S. Attorney's Office
        450 Golden Gate Ave., 11th Floor
        San Francisco, CA 94102
        Office: 415-436-7200
        Alexis.Loeb@usdoj.gov